**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

_____

CATHERINE ZAHARKO and
DOUGLAS FRARY,

     Plaintiffs,

     v.                                   No. 1:17-cv-00489-WJ-JHR

SAN JUAN REGIONAL MEDICAL
CENTER EXECUTIVE 457(f)
RETIREMENT PLAN,

     Defendant.

## MEMORANDUM OPINION AND ORDER
## DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court upon Defendant's Motion for Summary Judgment, filed February 1, 2018 **(Doc. 26)**. Having reviewed the parties' pleadings and the applicable law, the Court finds that Defendant's motion is not well-taken and, therefore, is denied.

## BACKGROUND

Plaintiff Catherine Zaharko worked for San Juan Regional Medical Center ("Medical Center") with her last position as Vice-President of Marketing and Communications for about twelve years. Plaintiff Douglas Frary worked for Defendant for almost thirty-three years, with his last position as Vice-President of Professional and Support Services. Both plaintiffs seek payment of retirement benefits under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001, et seq. ("ERISA").

## I.     Facts[1]

---

[1] The facts, including any relevant additional facts submitted by Plaintiff, are woven into the factual narrative here for ease of reading, and are undisputed unless otherwise noted. Also, the Court omits references to supporting exhibits except where necessary.

A.    Employment Agreement

Both Plaintiffs were employed at the Medical Center pursuant to identical other-than-salary-amount employment agreements that provided for an employment benefit of severance pay equal to two years of their respective salaries.   The relevant clauses of these employment agreements stated as follows:

> Section IX
> TERMINATION
> If Employer elects to terminate this Agreement, Employee shall be entitled to continued compensation at the most recent annual base salary rate but excluding bonus and any incentive pay for the notice period set forth above, and for the following additional months depending on the length of service during the Contract Period. Contract period shall mean continuous employment from July 1, 2003; Employee hire date; or the Employee appointment date, whichever is latest.
> …
>           . . . During the third 12 months of Contract Period and thereafter = twenty-four (24 months).

Ex. C. ("Section IX"). Each Plaintiff was entitled to this additional payment for twenty-four months based on the time they had been employed by the Medical Center at all times relevant to this Response.

Each Plaintiff was not entitled to this additional payment of twenty-four months of base salary if he or she voluntarily chose to terminate their agreement.  The severance package was available only if the Employer terminated the agreement.  These employment agreements were for a term certain but renewed automatically each year unless notice of termination of the agreement was sent per the terms of Section IX of the employment agreement ("agreement").   In their declaration, Plaintiffs submit that these employment agreements originated as a means to retain a select group of management or highly compensated employees.

B.    Executive Compensation Policy

In August 2017, Plaintiff Zaharko and Plaintiff Frary were each informed by the Jeff Egbert, the interim chief executive officer ("CEO") of the Medical Center that the employment of all executives was being transitioned to an employment at-will arrangement subject to an executive compensation policy, which necessitated the termination of the employment agreements for Mr. Zaharko and Mr. Frary. Upon these agreements being terminated, plaintiffs' employment would continue if they agreed to be employed under a new policy affecting senior management that reduced their severance benefit to one year and made them employees at-will without a written employment agreement. Agreeing to terminate their employment agreement and be subject to only the new policy affecting senior management would cost Catherine Zaharko $179,725.20, and Doug Frary $218,400.00 in severance money benefits.

When Jeff Egbert began work at the Medical Center as the interim CEO before Jeff Bourgeois became CEO, he believed these high-level management employment agreements were too "excessive" or lucrative in the amount of severance offered and that they were too "one-sided" in favor of the employee with regard to an employee's obligations to assist the Medical Center.[2] Mr. Egbert recommended, and the Medical Center Board approved, a new executive compensation policy that would terminate each of these agreements and make each of those management employees (including Plaintiffs) choose to become employees at-will, and to reduce the severance payable from two years to one year only.

A choice was unilaterally imposed on each employee by the Medical Center: quit, and receive the benefits of their existing contracts or continue under the new policy as employees at-will with reduced job security and reduced severance benefits. However, neither Plaintiff had an

---

[2] In his deposition, for example, Mr. Egbert explained that generally such severance packages include a requirement that the separated employee be available for legal issues or questions that might come up during the time he or she is receiving the severance package. *See* Doc. 31-1 at 19:1-8.

expectation or belief that the Medical Center would terminate employment as an employee under the new policy.[3] Faced with the loss of their secure employment agreements guaranteeing their employment absent notice and/or a stated reason for termination, and the loss of one year's severance going forward, both refused to agree sign a document memorializing the mutual termination of the employment agreement and transition to at-will employment.  Ms. Zaharko notified Mr. Egbert, the interim CEO of the Medical Center of her decision to resign via email on August 15, 2017.

The Medical Center unilaterally terminated Plaintiffs' employment agreements.

Both Plaintiffs received the additional two-year severance payment upon their separation from employment at the Medical Center.  In this lawsuit, Plaintiffs seek the benefits of their deferred compensation retirement plan.

C.     Executive 457(f) Retirement Plan

1.     *Description of Defendant Plan*

Plaintiffs have brought their claims under the Medical Center Executive 457(f) Retirement Plan ("Defendant Plan" or "the Plan").  The Plan is a nonqualified deferred compensation plan that complies with § 457(f) of the Internal Revenue Code of 1986, as amended ("IRS Code").  As described by Defendant (and not disputed by Plaintiff) Defendant Plan is a "top-hat plan," which is an unfunded plan maintained primarily for the purpose of providing deferred compensation benefits for a select group of management under §§ 201(2), 301(a)(3) and 401(a)(1) of  ERISA.  As a top-hat plan, the Plan is exempt from ERISA's participation, vesting funding, and fiduciary

---

[3] Plaintiff Zaharko contends that this statement, Deft's Fact 6, is taken out of context, since her employment was being unilaterally terminated.  However, the purpose of the unilateral termination that was being offered was to have her continue as an at-will employee.  This is a different issue from whether Plaintiff expected to be terminated *even if* she signed the mutual termination agreement.  Plaintiff stated that being terminated after becoming at-will "was certainly a fear" she had, but stated that no one had indicated that the new CEO coming in was going to terminate her or any other vice-president.  Doc. 26-4 at 3-13.  Plaintiff Frary also was unaware of any intention on the part of Mr. Egbert or the Board to terminate his employment (as opposed to terminating the employment agreement and becoming an at-will employee).  Doc. 26-5 at 20-25.  Therefore, Defendant's Fact 5 remains undisputed.

rules contained in §§ 201, 301, and 401. However, the Plan is subject to ERISA's enforcement rules, including ERISA §§ 502(a)(1)(B), 29 U.S.C. 1132(a)(1)(B).

Defendant Plan is composed of a plan document and an adoption agreement, and was established effective January 1, 2008 pursuant to an adoption agreement dated April 8, 2008 ("2008 Adoption Agreement"). The Plan was amended effective January 1, 2008 pursuant to a new adoption agreement dated April 20, 2009 ("2009 Adoption Agreement"). Defendant Plan was amended again effective January 1, 2012 pursuant to a new adoption agreement dated December 30, 2011 ("2011 Adoption Agreement").

Section 8.2 of the plan document regarding General Administration of Defendant Plan provides that:

> [A] Committee is responsible for the operation and administration of Defendant Plan and for carrying out its provisions. Each of the aforementioned adoption agreements provide that [the Medical Center] shall serve as the committee. As a general matter, when such designations are made, the CEO of [the Medical Center] has authority to act on behalf thereof.

Ex. 10 (Bourgeois Aff.) & attached Ex. A.

Section 8.2 of the plan document further provides that

> . . . the "Committee shall have the full authority and discretion to make, amend, interpret, and enforce all appropriate rules and regulations for the administration of this Plan and decide or resolve any and all questions, including interpretation of this Plan, as may arise in connection with this Plan. Any such action taken by the Committee shall be final and conclusive on any party. To the extent the Committee has been granted discretionary authority under the Plan, the Committee's prior exercise of such authority shall not obligate it to exercise its authority in a like fashion thereafter.

Ex. 10 & attached Ex. A

The 2009 Adoption Agreement provided that a plan participant in the Defendant Plan would vest in his or her account in the following circumstances:

An Active Participant shall be fully vested in their Deferred Compensation Account upon
the first to occur of the following dates:
. . .

(c) The date the Participant attains age 62 and completes 5 years of Service.
. . .

(e) The date the Participant has an Involuntarily [sic] Separation from Service from the
Employer without Cause.

(f) The date of a Change in Control Event.

Ex. 10 & attached Ex. C.[4]

The 2011 Adoption Agreement provided that a plan participant in Defendant Plan would

vest in his or her account in the following circumstances:

An Active Participant shall be fully vested in their Deferred Compensation Account upon
the first to occur of the following dates:
. . .

(d) The specific date for the Participant as selected in writing by the Employer.

(e) The date the Participant has an Involuntarily [sic] Separation from Service from the
Employer without Cause.

(f) The date of a Change in Control Event.

Ex. 10, (Bourgeois Aff.) & attached Ex. D.

An "Involuntary Separation from Service" is defined in § 2.17 as an "involuntary

separation from service" within the meaning of Section 409A of the IRS Code including

"separations from service for good reason."

Defendant's Motion argues that Plaintiffs voluntarily quit their employment, and that

Plaintiffs were not terminated for Cause under their Employment Agreements.

2.     *Claims for Benefits Under Defendant Plan as Basis for Lawsuit*

---

[4] The Court assumes that "Exhibit 10" is meant as "Exhibit 6" (Doc. 26-6), since there is not Exhibit 6 submitted by
Defendant, and portions of the Plan provisions are in Exhibit 6, and the attached exhibits C & D to Exhibit 6).

Jeff Bourgeois, as Plan Administrator (*see* Compl., ¶21), denied both claims for benefits under the Plan by letter dated November 14, 2016 for the specific reason that Plaintiffs were not vested in their respective accounts. Through counsel, Plaintiffs appealed the decision of Defendant Plan by letter of January 6, 2017. The Plan responded on February 14, 2017, denying the appeal and providing information regarding the Plaintiffs' rights to bring a civil action pursuant to ERISA Section 502 [29 U.S.C. § 1132(a)(1)(B)].

Before denying Plaintiffs' appeal of the denial of their 457(f) funds, Mr. Bourgeois did not consult either Ms. Zaharko or Mr. Frary as to the circumstances of their separation from their long employment with the Medical Center, nor did he review either of Plaintiffs' employment agreements. In his deposition, Mr. Bourgeois stated that he "didn't have any knowledge of the existing agreements . . . Ex. B at 14:8-15:6. Mr. Bourgeois also stated that he did not review any of the applicable IRS Code or Treasury Regulations by which the Plan states it is to be interpreted, although he acknowledged that §409A of the IRS Code guides the interpretation of the Plan language.

Mr. Bourgeois acknowledged that did not consult Mr. Egbert regarding the denial of the appeal even though it was Mr. Egbert who had prompted this review of and subsequent termination of the employment agreements. He stated that he was informed "that all of the individuals who had the agreements that were in place were given the option to mutually agree to terminate the agreement [to] continue employment or to terminate the agreement and accept the severance." Ex. B at 33:1-9. In response to queries by opposing counsel, Mr. Bourgeois stated that before denying Plaintiff's claims for Plan benefits, he had not considered the fact that other senior management employees who had been terminated had been paid their §457(f) money.

**II.     Legal Standard**

Summary judgment is appropriate where no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, that party must "go beyond the pleadings" and "designate specific facts" so as to "make a showing sufficient to establish the existence of an element essential to that party's case" in order to survive summary judgment. *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986), cited in *Ford v. West*, 222 F.3d 767, 774 (10th Cir. 2000).

**DISCUSSION**

Plaintiffs allege that Defendant's decision to deny payment of benefits from the Plan was arbitrary and capricious and seeks payment of all such benefits by Defendant Plan to Plaintiffs; whereas Defendant contends that Plaintiffs were not entitled to those benefits because they voluntarily quit their employment and so were not "involuntarily" separated which is required to obtain Plan benefits.

**I.     Standard of Review**

The United States Supreme Court  has held that a denial of benefits challenged under ERISA is reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  The Tenth Circuit follows this standard.  If the benefit plan gives discretion to a plan administrator, then a decision denying benefits is typically reviewed under an arbitrary and capricious standard. *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co.*, 491 F.3d 1180, 1189 (10th Cir. 2007) ("a] court reviewing a challenge to a denial of employee benefits . . . applies an 'arbitrary and

capricious' standard to a plan administrator's actions." *Charter Canyon Treatment Ctr. v. Pool Co.,* 153 F.3d 1132, 1135 (10th Cir.1998). The court's review is "limited to determining whether [the plan administrator's] interpretation was reasonable and made in good faith." *Fought v. UNUM Life Ins. Co. Of Am.*, 379 F.3d 997, 1003 (10th Cir. 2004). This review is limited to the "administrative record," that is, the materials compiled by the administrator in the course of making his decision. *Id.* (citation omitted). *Id.*

Plaintiffs objects to using the arbitrary and capricious standard, relying solely on a First Circuit case, *Hannington v. Sun Life & Health Ins. Co.,* 711 F.3d 226, 230-32 (1st Cir. 2013). They urge the Court to apply a *de novo* standard because Mr. Bourgeois' decision as the plan administrator, should have been based on materials other than solely Plan documents. The *Hannington* decision does not persuade the Court to apply a *de novo* review. First, Plaintiffs offer nothing other than the few First Circuit cases following *Hannington's* holding, and the Court's review of the case law has thus far found no other cases favoring Plaintiffs' position on this issue. Second, in determining whether a separation from service is involuntary, IRS code regulations require a plan administrator to consider "all the facts and circumstances." 26 CFR 1.409A-1(n)(1). The administrator is not required to interpret statutes.

Plaintiffs mischaracterize the holding in *Hannington* to where it becomes unrecognizable. In *Hannington,* the plan administrator's interpretation of a provision in the plan regarding "Other Income" depended entirely upon the administrator's interpretation of several other statutes. Because the decision to offset plaintiff's benefits under the plan was governed by this interpretation, the First Circuit concluded that the district court should have reviewed *de novo* the interpretation given by the plan administrator to those statutes. A *de novo* review was therefore appropriate in the *Hannington* case, under First Circuit law and in those particular circumstances,

*because* the plan administrator had made its own interpretation of certain statutes. This is not the same, by any means, as holding that a plan administrator *should* depend on outside materials and interpret statutes in making a benefits decision.

It is undisputed that the Plan expressly gives the Medical Center, and specifically Mr. Bourgeois as CEO and Plan Administrator, the discretion to determine whether to deny Medical Center employees benefits under the Plan. Under Tenth Circuit law, a plan administrator is expected to interpret or construe the terms of the plan in making a benefits decision, and a review of that decision is subject to an arbitrary and capricious standard which will be applied here as well. *See, e.g., Fought v. UNUM Life Ins. Co. Of Am.*, 379 F.3d 997, 1003 (10th Cir. 2004) (where there was no dispute that the plan granted administrator discretion in whether to deny claimants insurance benefits, a reviewing court applies arbitrary and capricious standard).

This is not to say that courts may not depart from an arbitrary and capricious standard of review. Less deference to the plan administrator is appropriate, for example, where the administrator is operating under a conflict of interest, in which case that conflict "may be weighed as a factor in determining whether the plan administrator's actions were arbitrary and capricious." *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co*., 491 F.3d 1180, 1189-90 (10th Cir. 2007); *see also Fought v. UNUM Life Ins. Co. Of Am*., 379 F.3d 997, 1003 (10th Cir. 2004). Plaintiffs raise the conflicts issue with regard to Mr. Bourgeois, which the Court will take up later.

## II.    Analysis

This lawsuit comes down to whether Plaintiffs separated from their employment at the Medical Center involuntarily, in which case they would be entitled to Plan benefits; or voluntarily, in which case they would not be vested in the Plan in order to receive those benefits.

A.  <u>Involuntary Separation from Service Under IRS Code §409A</u>

Defendant contends that the Medical Center, acting through its CEO Jeff Bourgeois, demonstrated good faith administration in the decisions made regarding Plan benefits. Plaintiffs were both provided detailed and written explanations for the denial of benefits under their §457 accounts. Their claims for benefits under the Plan were denied by letter dated November 14, 2016 because Plaintiffs were not vested in their respective accounts. It was specifically noted for each Plaintiff that he or she had not met either of the applicable requirements: neither had reached age 62 while an Active Participant and neither had an involuntarily separation from service from the Employer without Cause.[5]

Both Plaintiffs had accounts that were subject to the vesting provisions of the 2009 Adoption Agreement. Section 2.17 of the Plan document defines an "Involuntary Separation from Service" for both the 2009 Adoption Agreement and the 2011 Adoption Agreement as an "involuntary separation from service" within the meaning of Section 409A of the Code including "separations from service for good reason." Treasury Regulation Section 1.409A-1(n)(1) provides the following:

> (1) Involuntary separation from service- (1) In general. **An involuntary separation from service means a separation from service due to the independent exercise of the unilateral authority of the service recipient to terminate the service provider's services, other than due to the service provider's implicit or explicit request, where the service provider was willing and able to continue performing services.** An involuntary separation from service may include the service recipient's failure to renew a contract at the time such contract expires, provided that the service provider was willing and able to execute a new contract providing terms and conditions substantially similar to those in the expiring contract and to continue providing such services. **The determination of whether a separation from service is involuntary is based on all the facts and circumstances.** Any characterization of the separation from service as voluntary or involuntary by the service provider and the service recipient in the documentation of the separation from service is presumed to

---

[5]  Plaintiffs do not raise an issue regarding the age requirement for vesting, and so the Court does not address it, either.

properly characterize the nature of the separation from service. However, the presumption may be rebutted where the facts and circumstances indicate otherwise. For example, **if a separation from service is designated as a voluntary separation from service or resignation, but the facts and circumstances indicate that absent such voluntary separation from service the service recipient would have terminated the service provider's services, and that the service provider had knowledge that the service provider would be so terminated, the separation from service is involuntary.**

26 CFR 1.409A-1(n)(1) (emphasis added). Defendant contends that the Plan Administrator concluded that based on the facts and circumstances, Plaintiffs were not involuntarily separated from service as defined under these regulations. Both Plaintiffs were given two options: either quit and take the severance under their previous employment agreement or continue with a reduced severance package and at-will status. Both Plaintiffs refused to sign the termination agreement, and decided to resign. Defendant maintain that because Plaintiffs were not terminated by the employer's unilateral decision, they were therefore not entitled to benefits under the §457(f) Retirement Plan.

Plaintiffs claim that their separation from employment was involuntary based on several provisions in 26 CFR 1.409A-1(n)(1), which the Court will address in turn.

- **An employee's separation from employment was due to the independent exercises of the Employer's unilateral authority, as described in Section 409A-1(n)(1).**

Plaintiffs contend that the Medical Center unilaterally decided that Plaintiff's employment agreements would be terminated. If they continued employment, their relationship would be changed to at-will status and their severance package would be reduced in half, from two years to one year.

Defendant claims that Plaintiffs are taking the provision out of context and omit the language, "other than due to the service provider's implicit or explicit request, where the service provider was willing and able to continue performing services." However, the Court fails to see

the relevance of the omitted language since neither Plaintiff (the "service provider") implicitly or explicitly requested the termination of his or her employment.  The evidence indicates that while Plaintiffs resigned from employment, they were not "willing" to continue employment under the new policy.

- **An involuntary separation from service may include the employer's failure to renew a contract at the time that contract expires if the new contract does not provide terms and conditions substantially similar to the expiring contract.  *See* 26 CFR 1.409A-1(n)(1).**

Plaintiffs argue that replacement of the employment agreement with the executive compensation policy was not a similar replacement because it reduced Plaintiffs' job security by reducing their employment status to at-will, and reduced severance package benefits.

Defendant claims that this provision is inapplicable here because the facts do not involve the non-renewal of a contract.  However, it is undisputed that the employment agreements were for a term certain but renewed automatically each year.  Pltffs' Add'l Fact J.  Thus, this part of 26 CFR 1.409A-1(n)(1) could apply to the facts in this case, and since §409A guides the interpretation of the Plan terms, there is a dispute of fact as to whether the "replacement," that is, the executive compensation policy, was "substantially similar to the expiring contract."   If not, then Plaintiffs' decision to quit rather than accept a non-similar agreement could be interpreted under §409A as "involuntary separation."

- **Where facts and circumstances indicate that absent an employee's voluntary separation from service, the employer would have terminated the employee's service and the employee knew that he would be so terminated, the separation from service is involuntary.  *See* 26 CFR 1.409A-1(n)(1).**

Plaintiffs claim that they were concerned that the Medical Center's objective was to do away with the higher-salaried employees whose contracts were considered "too lucrative," and

that they were being asked to continue employment under as at-will employees so that they could be terminated more easily and with less expense to the hospital.

Defendant contends that this provision is also inapplicable to this case because the facts and circumstances indicate that the Medical Center intended for the Plaintiffs to continue employment. The Court agrees with Defendant that this part of the §409A provision is not relevant to the situation here at all, since it is undisputed that neither Plaintiff had an expectation or belief that the Medical Center would terminate employment if either continued working as an at-will employee. *See* n.3, supra.

- **The determination of whether a separation from service is involuntary is based on all the facts and circumstances. *See* 26 CFR 1.409A-1(n)(1).**

Plaintiffs contend that the Plan administrator's denial of Plaintiffs' benefits was arbitrary. They note that the Medical Center pays severance under the existing employment agreement only where the Medical Center decides to terminate those agreements. Here, however, the Medical Center paid Plaintiffs' severance even though Plaintiffs voluntarily resigned rather than agree to a mutual termination and employment under the new executive compensation policy.

Defendant argues that the Medical Center's decision on the severance provision has no bearing on the denial of benefits under the Plan because the severance provisions in Plaintiffs' employment provisions were governed by a "much more liberal standard." Doc. 34 at 7-8. Under the employment agreement, Plaintiffs were entitled to severance if the Medical Center elected to terminate the agreement. *See E*x. C (continued compensation for period of time after separation "if Employer elects to terminate this Agreement. . . ."). However, under the regulations which serve as a guide in interpreting the Plan documents for Plaintiffs' §457 retirement plan, "[a]n involuntary separation from service means a separation from service due to the independent exercise of the unilateral authority of the [employer] to terminate [the employee's] service." 26

CFR 1.409A-1(n). Defendant is therefore correct in stating that termination of the employment agreement did not dictate whether Plaintiffs' separation would be considered voluntary or involuntary. In other words, the Medical Center's termination of the *agreement* did not necessarily result in the termination of Plaintiffs' *employment*. Even after the employment agreements were terminated, Plaintiffs still had the option to choose either to quit and receive benefits under the existing agreement, or to continue employment under the new policy. Both chose to resign, and their claims for Plan benefits were denied. Before making that decision, Mr. Bourgeois did not consult either plaintiff as to the circumstances of his or her employment, nor did he have any knowledge of the agreements that governed that employment. He did not consult Mr. Egbert regarding the denial of Plaintiffs' appeal, even though it was Mr. Egbert who had prompted the review of and subsequent termination of the employment agreements.

In addition, both Plaintiffs requested that Mr. Bourgeois reconsider the denial of their claims, and informed him that other employees who had either quit or fired had been paid out the §457 Plan benefits automatically, without a review process:

> We have a couple of concerns. First, Karen Miller has told us that the 457f is "under review." We do not know what this means. Whether members of the executive team quit, were fired or retired, they received their 457f no questions asked. When Bill Noel (who was fired from [the Medical Center]), Mike Philips (retired from [the Medical Center]), Tom Dean (quit), Rich Wallace (fired) and John Buffington (asked to leave?), there no "review" process. The precedence [sic] is that the 457f is automatically paid out; it does not stand to reason that there should there [sic] be a need of a review for us (Catherine and Doug).

Doc. 31-4; *see also* Doc. 31-5, ¶9, Doc. 31-6, ¶9. Mr. Bourgeois was asked in his deposition whether he had considered whether other senior management employees had been terminated but had been paid their §457(f) money before denying benefits to Plaintiffs, but Mr. Bourgeois stated that he had not.

15

Defendant offers nothing in response to Plaintiffs' assertions of similarly situated employees receiving the §457(f) Plan benefits, and so the Court is left with the inference from the facts presented here that Defendant's decision was made without consideration of all the facts and circumstances surrounding Plaintiffs' separations from employment and that the denial of Plan benefits could be considered arbitrary and capricious by a reasonable fact finder.

B.     Voluntary Separations That Are Considered "Involuntary"

Section 409A regulations also describe situations where a "voluntary separation" from service is treated as an "involuntary separation."  These regulations describe certain situations where separation from service for "good reason" is nevertheless treated as "involuntary separation" under the IRS Code:

> (2) Separations from service for good reason - (i) In general. Notwithstanding paragraph (n)(1) of this section, a service provider's voluntary separation from service will be treated for purposes of this section and §§ 1.409A-2 through 1.409A-6 as an involuntary separation from service if the separation from service occurs under certain limited bona fide conditions, where the avoidance of the requirements of section 409A is not a purpose of the inclusion of these conditions in the plan or of the actions by the service recipient in connection with the satisfaction of these conditions, and a voluntary separation from service under such conditions effectively constitutes an involuntary separation from service. **Generally such conditions will be prespecified under an agreement to provide compensation upon a separation from service for good reason. Such a good reason (or a similar condition) must be defined to require actions taken by the service recipient resulting in a material negative change to the service provider in the service relationship, such as the duties to be performed, the conditions under which such duties are to be performed, or the compensation to be received for performing such services**. Other factors taken into account in determining whether a separation from service for good reason effectively constitutes an involuntary separation from service include the extent to which the payments upon a separation from service for good reason are in the same amount and are to be made at the same time and in the same form as payments available upon an actual involuntary separation from service, and whether the service provider is required to give the service recipient notice of the existence of the condition that would result in treatment as a separation from service for good reason and a reasonable opportunity to remedy the condition. 26 CFR 1.409A-1(n) (emphasis supplied).

26 CFR 1.409A-1(n)(2) (emphasis added). Plaintiffs claim that their separation from employment was "involuntary" even though they opted to resign rather than sign the mutual termination agreement and continue as at-will employees, relying on the "material change" clause:

- **A "good reason" for separation must be defined in an agreement "to require actions taken by [the employer] resulting in a material negative change to [the employee] in the service relationship, such as the duties to be performed, the conditions under which such duties are to be performed, or the compensation to be received for performing such services.** *See* **26 CFR 1.409A-1(n)(2).**

Plaintiffs contend that the new executive compensation policy imposes changes that are "material negative changes" to their employment relationship. Defendant again argues that this provision of §409A is inapplicable because it only applies where the employment arrangement pre-specifies the "good reason" for separation from service.[6] Here, the plan document did not provide for any "good reasons" that would be treated as an involuntary separation from service, and thus Plaintiffs cannot rely on this provision.

The Court cannot say as a matter of law that being reduced to at-will status qualifies as a "material negative change" under the regulations interpreting §409A of the IRS Code. In his deposition, Mr. Bourgeois told counsel for Plaintiffs that he did not view the executive compensation policy as including any "material" changes to Plaintiffs' employment status. Doc. 31-2 at 24:1-16. He also did not characterize severance packages as a "benefit" since severance did not become a "benefit" to an employee until it was used and severance was of no use—and therefore no "benefit"—to an employee who left without cause. Doc. 31-2 at 29:1-20; *see* Doc.

---

[6] The exact language in the provision reads in relevant part:

> Generally such conditions will be prespecified under an agreement to provide compensation upon a separation from service for good reason. Such a good reason (or a similar condition) must be defined to require actions taken by the service recipient resulting in a material negative change to the service provider in the service relationship, such as the duties to be performed, the conditions under which such duties are to be performed, or the compensation to be received for performing such services.

. 26 CFR 1.409A-1(n) (emphasis supplied).

17

31-2 at 27:1-4 (stating that employer-sponsored health care and 403(b) contributions were considered employee "benefits").

There is room for disagreement on this issue. Parties offer no case law resolving the question of whether or not the changes contained in the executive compensation policy should be considered "material negative" changes, and the Court's review has not uncovered any cases, either. The relevant question here is whether the Plan administrator's conclusions on this issue were made in good faith, and were reasonable and not arbitrary and capricious. Mr. Bourgeois acknowledged that §409A of the IRS Code guides the interpretation of the Plan language and also admitted that he did not review §409A provisions in making the decision denying Plaintiffs benefits under the Plan. Ex. B at 22:1-6. He therefore would not have considered whether Plaintiffs' separations would qualify as "involuntary separations" under 26 CFR 1.409A-1(n)(1) and (n)(1), even where some of those facts and circumstances could have suggested that Plaintiffs were involuntarily separated. Mr. Bourgeois stated:

> I didn't consult with anybody about [the Plaintiffs]. I was informed that all of the individuals who had the agreements that were in place were given the option to mutually agree to terminate the agreement to . . . continue employment or terminate the agreement and accept the severance. And all but Catherine and Doug chose to stay employed, with the exception of one individual whose position as eliminated.

Doc. 31-2 at 9:1-8.

C.    Conflict of Interest

Plaintiff contends that Mr. Bourgeois operated under a conflict of interest as both the Plan administrator and decisionmaker on denying benefits. Defendant acknowledges the existence of a possible conflict, but insists that such a conflict among similar plans is common and manageable, and does not require a change in the standard of review.

The United States Supreme Court has held that the conflict of interest arising from the dual role of an entity as an ERISA plan administrator and payer of plan benefits should be a factor in determining whether the plan administrator has abused its discretion in denying benefits, with the significance of the factor depending upon the circumstances of the particular case. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008) (conflict of interest arising from the dual role of an entity as an ERISA plan administrator and payer of plan benefits as a factor in determining whether the plan administrator has abused its discretion in denying benefits, with the significance of the factor depending upon the circumstances of the particular case). The Tenth Circuit uses a "sliding scale approach" in assessing the impact of such conflict, decreasing the level of deference given . . . in proportion to the seriousness of the conflict. *Weber v. GE Grp. Life Assur. Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008) (citing *Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co*., 491 F.3d 1190 (10th Cir. 2007); *see also Foster v. PPG from Indus., Inc*., 693 F.3d 1226, 1232 (10th Cir. 2012) (where a plan administrator is "operating under a conflict of interest, that conflict may be weighed as a factor in determining whether the plan administrator's actions were arbitrary and capricious").

In this case, there is evidence suggesting that Mr. Bourgeois was operating under a conflict of interest in deciding whether Plaintiffs received Plan benefits. As interim CEO of the Medical Center, Jeff Egbert believed that the hospital's high-level management employment agreements were too "excessive" or too lucrative in terms of the amount of severance offered. Mr. Egbert also believed that the agreements were too "one-sided" in favor of the employee with regard to an employee's obligations to assist the Medical Center after their separation under such an agreement. Mr. Egbert knew Mr. Bourgeois as a college friend and then professionally for years. Prior to the time Mr. Bourgeois took over as CEO of the Medical Center, Mr. Egbert had

conversations with him about the change in policy that led to the termination of the senior management contracts prior to the time Mr. Bourgeois took over as CEO of the hospital. *See* Ex. A (Egbert Dep.) at 12-14; Ex. B (Bourgeois Dep.) at 11:7-20.

Mr. Bourgeois would have also have been made aware of the reason behind the policy change: to eliminate the more lucrative senior management contracts and replace them with something that was less costly to the Medical Center. Given this objective, an inherent conflict could certainly exist in having the CEO of the Medical Center interpret Plan terms and decide whether the Medical Center was obligated to pay out those benefits, but Mr. Bourgeois did not take any particular steps to minimize that conflict. Based on the evidence presented here, the presence of conflict would be a significant factor in considering whether Mr. Bourgeois abused his discretion in denying benefits to Plaintiffs.

A reasonable fact finder could therefore conclude that Mr. Bourgeois acted arbitrarily or unreasonably when he (1) failed to consider all the facts and circumstances related to Plaintiffs' separation from employment and (2) failed to consider the relevant guidelines interpreting Plan terms.

## CONCLUSION

A court's review of denial of benefits under ERISA is limited to determining whether the plan administrator's interpretation of Plan documents was reasonable and made in good faith.

The Court finds and concludes that in this case, there are material disputes as to whether the Plan administrator considered all the facts and circumstances in concluding that Plaintiffs were not vested in the retirement Plan because they did not have an involuntary separation of employment, including reference to §409A of the IRS Code and accompanying regulations which interpret Plan terms. A reasonable fact finder could therefore find that the denial of Plan benefits

was arbitrary and capricious, and not conducted in good faith.  Further, a reasonable fact finder could conclude that the dual role of CEO/Plan Administrator taken up by Mr. Bourgeois presented an inherent conflict and was a significant factor in the decision to deny Plan benefits.

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (**Doc. 26**) is hereby DENIED for reasons described in this Memorandum Opinion and Order.

_____

CHIEF UNITED STATES DISTRICT JUDGE